FILED
2010 Aug-23  PM 04:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DOUGLAS ARNOLD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 2:08-cv-00927-HGD |
| | ) | |
| HOLIDAY PLUMBING SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the Motion for Summary Judgment filed by defendant, Holiday Plumbing Services, Inc. (Doc. #22). This matter is before the undersigned U.S. Magistrate Judge based on the consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed.R.Civ.P. Plaintiff, Douglas Arnold, brought this action alleging that defendant, Holiday Plumbing Services, Inc., (Holiday Plumbing or Holiday) violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.* (Doc. #17, Second Amended Complaint). Plaintiff also alleges state law causes of action for work and labor performed (*quantum meruit*) and breach of contract.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). However, "[a] court  need not permit a case to go to a jury when the inferences that are drawn from the evidence and upon which the non-movant relies are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 592, 106 S.Ct. at 1359). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

## COMPLAINT

In his complaint, Arnold alleges that his employer, Holiday Plumbing, failed to pay him for time he spent in the office and for overtime when he worked for over 40 hours in a week. (Doc. #17, Second Amended Complaint, at ¶¶ 16-20). He also asserts that he was paid less than similarly situated Caucasian employees and terminated because of his race, African-American, and replaced with a Caucasian. (*Id.* at ¶¶ 21-25). Plaintiff also claims that he was terminated within a month of having complained to his employer that he was not being paid the wages due him under the FLSA. (*Id.* at ¶ 26).

In Count I of his complaint, Arnold alleges, pursuant to the FLSA, that Holiday Plumbing willfully failed to pay him for compensable work and for overtime hours worked, resulting in lost wages. In Count II, he alleges that he was terminated in retaliation for complaining about not being paid wages owed under the FLSA. In Count III, plaintiff seeks a remedy in *quantum meruit*. Count IV seeks damages for breach of contract based on defendant's alleged failure to pay plaintiff for all hours worked. Count V alleges that defendant violated plaintiff's rights under 42 U.S.C. § 1981 by (a) paying him less than similarly situated Caucasian employees and (b) terminating him because of his race. Count VI alleges that defendant violated

Title VII also by (a) paying plaintiff less than similarly situated Caucasian employees and (b) terminating him because of his race.

In Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, plaintiff states that he is no longer pursuing his claims for retaliatory discharge in Count II, his claims for work and labor performed and breach of contract in Counts III and IV, and his claims for disparate pay under Title VII and § 1981 in Counts V and VI. The remaining claims are Count I, failure to pay overtime in violation of the FLSA, and racially motivated termination in violation of Title VII and § 1981 as alleged in Counts V and VI.

**DISCUSSION**

**Fair Labor Standards Act-Unpaid Overtime**

The FLSA dispute in this case centers around the pay system utilized by Holiday to pay its plumbers, a system that can, at best, be described as labyrinthine. Holiday Plumbing is owned by Bill Holcomb, Sr., but the day-to-day operations of the company were overseen by his son, Bill Holcomb, Jr.,[1] and Bill Holcomb, Jr.'s wife, Debbie Holcomb. Douglas Arnold was an apprentice plumber working for Holiday Plumbing at the time of his termination on March 6, 2008. Initially hired in

---

[1] All references to Bill Holcomb, unless otherwise noted, are references to Bill Holcomb, Jr.

2002 as a helper, he eventually worked his way up to the position of lead plumber or apprentice plumber.  Arnold was not a certified plumber, having failed the test on the one occasion he took it.  However, his pay was figured in the same manner as that of the certified plumbers; that is, he was paid on a commission basis.  (Arnold Depo. at 23; D. Holcomb Depo. at 23-24).  Nonetheless, plumbers were required to keep track of the hours they worked on a job.  This initially was performed by the plumbers, who kept their time on a particular job on a document called a "face sheet" which was maintained on a work-week basis.[2]  (Arnold Depo. at 18-19).  However, this document reflected the total time spent on particular jobs, which might extend over several days.  Thus, it was not an accurate accounting of the time spent at work on a particular day.  For this reason, their "attendance" (the time the plumbers came to the office in the morning and finally departed in the afternoon) was kept by a dispatcher. (D. Holcomb Depo. at 15, 60-61).

Plumbers were required to be in the office for meetings, usually by 7:30 a.m., in order to go over the work assignments for the day.  Likewise, according to plaintiff, they were required to come back to the office when they completed a job and required to wait there until the end of the work day in case another assignment

---

[2] A work week at Holiday Plumbing began on Thursday and ended the following Wednesday. Paychecks were distributed the following Tuesday.

were to come in.  Whether they were actually paid for this time is the subject of some

contention.

In any event, the earlier face sheet records used to track work performed by

plumbers (and plumber's helpers who were paid on an hourly basis) were destroyed

in a fire.  (D. Holcomb Depo. at 20-21).  The earliest payroll record submitted by

either party consists of a copy of the time card, paycheck summary and face sheet for

plaintiff for the week of November 30 to December 6, 2006.  (Defendant's Ex. F at

70-72).

In the Spring of 2006, after an investigation by the Wage and Hour Section of

the Department of Labor, Holiday installed a time clock to do a better job of tracking

employees' time.  (D. Holcomb Depo. at 55).  However, the plumbers continued to

keep face sheets in order to keep track of the time put into each particular job.  As a

general rule, plumbers were paid their commission on jobs when the job was

completed.  (*Id*. at 23-24).  Consequently, because the time spent on a job was

generally reflected on the face sheet on the day it was completed, the face sheets did

not accurately reflect the time that a plumber may have worked on that particular day.

For example, if a job was performed that took eight hours, which was started on a

Wednesday with four hours of work and completed on a Thursday with another four

hours of work, the face sheet would reflect all eight hours as having been performed

on Thursday, even though four hours were performed the previous day. However, on some occasions, plumbers were paid for jobs that were partially completed. (D. Holcomb Depo. at 25-26; Arnold Depo. at 44-45). As a result, it was not possible to tell whether the time worked on a job as reflected on the face sheet was work put in on one day or over several days. To figure this out required looking at the invoice prepared for the customer. (D. Holcomb Depo. at 60). To figure the amount of time actually worked in a 40-hour week by a plumber, Holiday initially relied on the times kept by the dispatcher and, later, the time clock.

As noted above, both parties agree that plumbers were paid on a commission basis. Likewise, there is no dispute regarding how the commission was figured. Each plumber was paid a 35% commission. The commission was figured against the amount paid by the customer for the job, less a 10% overhead charge, and less labor, including paying the hourly wage of the helper, gas and materials. (Arnold Depo. at 40). Thus, if a customer paid $1000.00 for a job to be performed, this amount would be reduced by $100.00 for overhead costs. Assuming materials cost $200.00, fuel $10.00 and a helper worked for eight hours at $8.00 an hour, the total would be reduced by another $274.00. The remaining $626.00 would be the basis for the

plumber's commission which, at 35%, would be approximately $219.00.[3] (D. Holcomb Depo. at 42-43).

Plaintiff received no other compensation besides the commissions. However, plaintiff also testified, and the three records submitted reflect, that his rate of pay at the time of his termination was $15.00 per hour. He claims that he finally achieved this amount when he complained to management about being paid less than another, less experienced employee. The significance of this will be discussed below.

When distributing the money earned by the plumbers as commissions, Holiday divided it up as part hourly wage and part "bonus." In all the records submitted to the court, Douglas Arnold's paycheck summary reflects that he was paid at a rate of $15.00 per hour. The face sheet for Arnold for the week of November 30 to December 6, 2006, reflects that Arnold finished jobs totaling 42.5 hours. He claims a commission totaling $382.87. Figures at the bottom right of this sheet reflect that Holiday Plumbing figured his total compensation for the week to be $1,065.37. This included 42.5 hours at $15.00 per hour (total: $637.50), plus two hours of overtime (total: $45.00) and Arnold's claimed commission of $382.87. (Defendant's Ex. F at 73). This totals $1,065.37.

---

[3] To be exact, the amount would be $219.10.

On the bottom left side of this document, Holiday Plumbing then refigures this amount taking the actual hours reflected on Arnold's time card for the week, which were 32.15 hours.  At $15.00 per hour, 32.15 hours totals $482.25.  The remaining amount, $583.12, is then designated as "bonus."[4]

Although paid the full commission amount of $1,065.37, the paycheck summary reflects that this amount is payment for working 32.15 hours at $15.00 per hour, or $482.25, with the remaining $583.12 designated as "bonus," as reflected on the bottom, left side of the face sheet.  (Defendant's Ex. F at 71).

Thus, according to Debbie Holcomb, Holiday Plumbing's pay for plumbers was figured by taking the total commission earned in a week (which might include amounts paid for work performed over more than one week, or more than one pay period, but not completed until this week) and then paying it out as payment for all hours worked, including "in-office" time, as determined by the time card, multiplied by the employee's hourly rate (*i.e.*, $15.00 per hour plus time-and-a-half, or $22.50 per hour, for overtime hours worked), with the remainder paid out as "bonus."

Arnold does not dispute that he was paid a set commission for each job.  After figuring his commission for a job, Arnold then divided his commission by the number

---

[4] Arnold's time card for that week reflects that he was on the clock for a total of 32.17 hours, which for pay purposes was rounded down to 32.15 hours, or 32 hours and nine minutes. (Defendant's Ex. F at 72).

of hours this job took to complete, as set out on the face sheet.  He subtracted this amount from his total commission.  It was included in his paycheck under his "hourly" earnings.  The remainder was listed on his face sheet as bonus.  (Arnold Depo. at 23-24, 27-28).[5]  According to Arnold, these payments were only for his work performed on each particular job and did not include any payment for "in-office" time or time spent "on-call."  (*Id*. at 33, 35, 38).

Arnold asserts that he worked overtime approximately 35 out of 52 weeks in 2006 and 2007.  However, he has no documentation or other evidence to support this claim.  (*Id*. at 22-23).  Arnold testified that he would clock in every morning upon arriving at work.  (*Id*. at 33).  He also claimed that when he got off work everyone was usually already gone from the office so that he could not clock out.  However, he also testified that a GPS system in place on the trucks would log in when they returned to the office and he also would verbally report the amount of time he worked.  (*Id*. at 29-31).  A review of the copies of time cards provided in the evidentiary submissions reflects several cards in which the clock-in or clock-out time is filled in by hand.  (*See* Defendant's Ex. F at 2, 26, 32, 56).  According to Arnold, with regard to the number of hours worked in a week, he states that his paychecks

---

[5]  Accordingly, a commission of $52.00 on a three-hour job would be figured by subtracting three hours times $15.00 per hour, or $45.00.  The remaining $7.00 would be listed as bonus.

reflected the hours he "presented to them." (Arnold Depo. at 32).[6] He admits that he signed these time cards before he turned them in. (*Id*. at 78). Thus, although the face sheets reflect only the hours spent out of the office on the job, there is no basis for concluding that the total time worked during a given week as reflected on the time cards and on plaintiff's paychecks is inaccurate. Aside from speculating that he worked over 40 hours a week in 35 out of 52 weeks in 2006 and 2007, he has provided no evidence to counter that presented by defendant, including plaintiff's own testimony, that the time cards submitted reflect the total time plaintiff was at work during a given day. In fact, the time cards uniformly reflect one sign-in time and one sign-out time per day. Given that the face sheets often reflect multiple jobs being performed by plaintiff on a given day, one would expect the time cards to reflect multiple sign-in and sign-out times on those days if the time cards reflected only the time he was actually on the job and not both in-office and out-of-office time.

Furthermore, the record evidence also reflects that plaintiff was paid overtime. His year-to-date earnings for the week ending December 20, 2006, reflect that he was paid overtime of $297.00 during that year. (Defendant's Ex. F at 67). At a pay rate of $15.00 per hour, this would reflect 39.6 hours of overtime. His overtime for 2007 is much less, that is, $11.25 or approximately one and a half hours of overtime.

---

[6] The time records submitted cover a period of from November 30, 2006, to December 26, 2007.

Nonetheless, overtime is reflected in his paychecks.  While plaintiff may believe he worked more overtime, he has presented nothing to substantiate this claim, other than his own speculation, which is totally lacking in specifics.  Plaintiff may not rely on his own unsubstantiated, bald assertions to create a genuine issue of fact.  *See Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1474 (11th Cir. 1991); *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1327 (11th Cir. 1998).

Although Arnold attempts to make an issue of this by stating in his declaration that he was not paid for in-office time, this is directly contrary to his deposition testimony that he clocked in each morning and that the time he left in the afternoon was recorded by clocking out in the afternoon, GPS records or his verbal report of the time he left.   (Arnold Depo. at 29-32).  His statements to the contrary in his declaration are due to be disregarded.  *Van T. Junkins and Assocs., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Consequently, the evidence is unrefuted that the hours worked reflected on the time cards reflects the amount of time plaintiff actually spent at work, including both in-office and out-of-office time.

The FLSA complaint by Arnold centers around his claim that his paycheck contains only the commissions he earned and no payment for the amount of time he spent in meetings and waiting in the office or on call.  He believes that he worked

uncompensated regular hours and overtime when all of his time on the job, in office and after hours on-call is taken into consideration.

Plaintiff's on-call time is not compensable.  The Department of Labor regulations provide:

> [a]n employee who is not required to remain on the employer's premises but is merely required to leave word at home or with company officials where he or she may be reached is not working while on call.  Time spent at home on call may or may not be compensable depending on whether the restrictions placed on the employee preclude using the time for personal pursuits.  Where, for example, a firefighter has returned home after the shift, with the understanding that he or she is expected to return to work in the event of an emergency in the night, such time spent at home is normally not compensable.  On the other hand, where the conditions placed on the employee's activities are so restrictive that the employee cannot use the time effectively for personal pursuits, such time spent on call is compensable.

29 C.F.R. § 553.221(d).

The United States Supreme Court decided two cases in the 1940s which addressed whether waiting time could be classified as compensable work under the FLSA.  *See Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).  These cases establish what is commonly referred to as the "waiting to be engaged" doctrine.  In both *Armour* and *Skidmore*, the United States Supreme Court

declined to offer any bright-line rules for determining the circumstances under which overtime compensation should be awarded for on-call time.  Instead, distinguishing between being "engaged to wait," which is compensable, and "waiting to be engaged," which is not compensable, the Supreme Court held that time spent waiting for work is compensable if the waiting time is spent "primarily for the benefit of the employer and his business." *Armour*, 323 U.S. at 132, 65 S.Ct. at 168; *Skidmore*, 323 U.S. at 137, 65 S.Ct. at 163.  This determination is dependent upon all the circumstances of the case.  *Armour*, 323 U.S. at 133, 65 S.Ct. at 168.  *Accord, Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164.

In *Birdwell v. City of Gadsden, Ala*., 970 F.2d 802 (11th Cir. 1992), the Eleventh Circuit Court of Appeals addressed the issue of compensation for time during which police detectives could have been called to duty.  970 F.2d at 807. *Birdwell* involved claims by city police detectives for overtime compensation for a one-week period during which they were on call due to a strike by other city employees.  *Id.* at 804.  During the on-call period, the detectives were instructed to be prepared to report to work immediately.  *Id.*  They could go home and they were not required to remain at the police station, but they could not leave their homes unless they left a forwarding number or they owned a beeper.  *Id.* at 808.  The detectives were prohibited from leaving town, drinking, going on vacation, or using

compensatory time during the on-call period.  *Id.* at 804, 808.  Some detectives testified that they could not go on outings with their families unless they took two cars. *Id.* at 808.  Detectives without beepers could not participate in outdoor activities such as fishing or hunting.  *Id.* at 808.  Despite the restrictions, several detectives worked two jobs, and none of them testified that they could not use their time at home as they wished.  *Id.*  The city argued that the officers were not working during this time for purposes of the FLSA and thus were not entitled to compensation.  *Id.* at 807.

The district court denied the city's motion for judgment as a matter of law and allowed the issue to be submitted to the jury, which found in favor of the police detectives.  *Id.*  The Eleventh Circuit Court of Appeals reversed and found that the city was entitled to judgment in its favor.  *Id.* at 810.  Despite the restrictions placed on the police detectives by the on-call policy, the Eleventh Circuit Court of Appeals found that their on-call time "was not used predominantly for the employer's benefit." *Id.* at 808.

Clearly, plaintiff was allowed to use his time on-call for his own personal pursuits.  Although he denies ever having refused to respond to a call from his employer, he testified that on one occasion he was called for an after-hours service call and advised his employer that it was going to take him some time to get to the customer because he was in Bessemer, a city located a short distance from

Birmingham.  He testified that when he advised Holiday of this, they simply told him "never mind."  (Arnold Depo. at 81-82).  Thus, the conditions placed on him were not so restrictive that he could not use his time for personal pursuits, and his on-call time was not used predominantly for his employer's benefit.  Therefore, he is not entitled to compensation for his time spent on-call as a matter of law.  Consequently, only the time spent in-office and on the job is compensable.  This time was accurately reflected in plaintiff's time cards and on his paychecks.

Except in circumstances not applicable here, an employee is entitled to overtime compensation for work performed in excess of 40 hours per week. 29 U.S.C.  § 207(a)(1).  Thus, non-exempt commission-based employees are also entitled to overtime.

Plaintiff asserts:

> If you pay an employee by straight commission rather than by the hour, it does not matter if you are able to calculate his work down to the nanosecond.  It is completely irrelevant under FLSA.  You still have only paid him straight time for all hours worked over forty hours in a week.  You have only paid him straight time for all hours worked.

(Doc. #25, Plaintiff's Brief in Opposition to Summary Judgment, at 17).  However, this contention is incorrect.  In order to determine whether a plaintiff who is paid on a commission basis has been properly compensated in accordance with the

requirements of the FLSA requires that courts first must determine the employee's "regular rate of pay" from which the hourly rate of overtime compensation is computed. The "regular rate" under the FLSA is an hourly rate even though the employee may receive commission earnings which are computed on other than an hourly basis. The regular rate is usually determined "by dividing (the employee's) total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. *See Brennan v. Lauderdale Yacht Basin, Inc.*, 493 F.2d 188, 191 (5th Cir. 1974).[7]

However, 29 U.S.C. § 207(g) states, in pertinent part:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, *pursuant to an agreement or understanding arrived at between the employer and the employee* before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection--

\* \* \*

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), the Eleventh Circuit accepted as binding precedent all Fifth Circuit cases decided before October 1, 1981.

> (3) is computed at a rate not less than one and one-half times the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder: Provided, That the rate so established shall be authorized by regulation by the Administrator as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time; . . . .

29 U.S.C. § 207(g)(3)(emphasis added).  *See also* 29 C.F.R. § 778.400.  In addition,

29 C.F.R. § 778.102 states, in pertinent part:

> Overtime pay for employees paid wholly or partly on a commission basis may be computed on an established basic rate, in lieu of the method described [in 29 C.F.R. 778.109].

In this case, the records and testimony reflect that plaintiff's agreed-upon regular rate of pay, at least since December of 2006, has been $15.00 per hour.  For any time over 40 hours worked, Holiday was thus obligated to pay an additional $7.50 per hour.  (*See* 29 C.F.R. § 778.110 (a)).  Holiday correctly figured plaintiff's compensation, for overtime purposes, as if he were an hourly employee earning $15.00 per hour.  That is, it took his commissions earned and divided into them the number of hours actually worked.  It then paid this amount to him at the agreed rate of $15.00 per hour for the hours he actually worked up to 40 hours, paid him $22.50 per hour for time worked over 40 hours, and paid any remainder as "bonus."

A review of Arnold's paychecks reflect that he received total compensation well in excess of $15.00 per hour for the time he worked.  None of his weekly paycheck summaries reflect payments in violation of the FLSA.  His year-to-date earnings as of the pay period ending December 21, 2006, reflect income totaling $60,697.48.  Assuming plaintiff worked every week for the entire year, his income for a 40-hour week at $15.00 per hour would total $31,200.00.  (52 weeks times 40 hours per week times $15.00 per hour = $31,200.00).  This leaves $29,497.48 to be applied to overtime.  At an overtime rate of $22.50, plaintiff's income reflects payment for nearly 1,311 hours of overtime.  ($29,497.48 divided by $22.50 per hour = 1,310.999 hours).  Thus, even if plaintiff was paid only for the time spent on work on jobs for customers, that amount is used to figure whether he was adequately compensated for all the time he spent on the job, including in-office time.  At his agreed rate-of-pay, he received full compensation for 52 weeks of 40-hour work-weeks and considerable overtime.

Likewise, his paycheck for the week ending December 19, 2007, reflects a year-to-date income of $55,646.16.  At the same pay rate, this leaves $24,446.16 attributable to overtime, which translates to approximately 1,086 overtime hours.  Consequently, plaintiff cannot prevail on his FLSA claim.

## Title VII and 42 U.S.C. § 1981-Racially Motivated Termination

In Counts V and VI, plaintiff alleges that defendant violated his rights under 42 U.S.C. § 1981 and Title VII for terminating him because of his race.[8]  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ."  42 U.S.C. § 1981(a).  Claims of race discrimination under 42 U.S.C. § 1981 are analyzed in the same manner as claims  brought under Title VII.  *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

---

[8]  In his brief, counsel for plaintiff claims that defendant waived any argument for the dismissal of this claim at summary judgment because it failed to provide any legal support for its position.  Although perhaps not a paragon of clarity, it is sufficiently clear that defendant is asserting facts and law to establish the basis for its claim that summary judgment is proper, that is, that plaintiff has failed to make out a *prima facie* case of discrimination and that it established an unrefuted, legitimate, non-discriminatory reason for terminating plaintiff.  Although some of the legal authority cited by defendant pertains to discrimination-based retaliation, it notes, correctly, that the analysis performed for such claims is analogous to that used for the claims similar to those made by the plaintiff.  A *McDonnell-Douglas* analysis is applicable to any Title VII or § 1981 claim based on circumstantial evidence.  Thus, the undersigned does not find this argument to be waived.

In evaluating a Title VII disparate treatment claim supported by circumstantial evidence, as here, the *McDonnell-Douglas* burden-shifting framework is used. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct.1817, 36 L.Ed.2d 668 (1973).  In order to make out a *prima facie* case of discriminatory discharge, a plaintiff must prove (1) that he is a member of a protected minority, (2) that he was qualified for the job from which he was discharged, (3) that he was discharged, and (4) that his former position was filled by a non-minority, *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982), or he was treated more harshly than other non-minority employees.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

Additionally, the Eleventh Circuit has held that "where the evidence does not fit neatly into the classic *prima facie* case formula . . ., a *prima facie* case of disparate treatment can still be established by any proof of actions taken by the employer" that shows a "discriminatory animus," where "in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."  *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999) (quotations and alteration omitted).  Thus, Arnold appears to argue, in the alternative, that he has presented sufficient circumstantial evidence of discriminatory animus to prove intentional discrimination.

Arnold is African-American, and his employers and co-workers are Caucasian. Therefore, he is a member of a protected class. There is also no claim that he was not qualified for his job, and he was undeniably discharged from his employment with Holiday Plumbing. However, it is disputed whether he was replaced by a non-minority or was treated less favorably than other employees.

One asserted basis for his termination was that Arnold took unapproved vacation. Arnold disputes this, testifying that he had the approval of Debbie Holcomb to take the vacation time at issue. (Arnold Depo. at 72). However, taking unapproved vacation time is not the only asserted basis for his termination. According to Bill Holcomb, Jr., the unauthorized vacation "was the final straw." (B. Holcomb Depo. at 28).

Prior to this incident, plaintiff was disciplined by Holiday for other reasons. Some of these incidents he acknowledges and some he denies. For instance, he was disciplined for performing plumbing work "side jobs" for which he received payment that was not shared with Holiday. According to Arnold's own testimony, he performed about 15 side jobs, but states that only one of them was performed on company time. (Arnold Depo. at 56). Arnold testified that the one job performed on company time was soldering a copper pipe for a William Simpson for which plaintiff was paid $75.00. (*Id*. at 66). He received a letter of reprimand dated July 5, 2007,

from Holiday Plumbing for this. (*Id.* at 67; Defendant's Ex. D-1, Letter dated July 5, 2007). This letter, from William Holcomb, reprimands Arnold "for doing side jobs while in a Holiday Plumbing vehicle and under false pretenses." Arnold admits receiving this letter and that it bears his signature. (Arnold Depo. at 67).

With regard to the other jobs, Arnold stated that he understood that it was a conflict of interest to do side jobs when he was "on the clock." However, he did not believe it to be a conflict of interest when he was not on the clock. (*Id.* at 64).

On another occasion, a Holiday employee, William Brewer, reported to Holiday that he went on a service call with Arnold on January 17, 2008, and when they finished the call, Arnold was approached by a neighbor who asked if he would take a look at his sink. According to a statement made by Brewer and read to Arnold at his deposition, Arnold got supplies and tools from the truck and went in the neighbor's residence from the truck. After Arnold finished, Brewer states that he saw the neighbor pay Arnold some money. (Arnold Depo. at 67-69). Arnold denies that this occurred. (*Id.* at 70). However, regardless of whether the allegation was true, Bill Holcomb testified that Brewer told him that this had occurred and he believes that he once again wrote up Arnold for this activity. (B. Holcomb Depo. at 19-21).

Arnold claims that there were other employees who did side jobs and that this was known to the Holcombs because it was discussed in the morning meetings.

However, Bill Holcomb testified that, while he had heard of others doing side jobs, Arnold was the only one he had been able to catch. (*Id*. at 18). Furthermore, assuming that the fact that others were doing side jobs was discussed at the morning meetings, there is no evidence that this type of activity was approved by the management at Holiday or that any one else was actually caught and not disciplined.

Arnold also was disciplined by Holiday on a couple of occasions for refusing to undertake certain assignments. On August 6, 2007, he received a letter of reprimand when a dispatcher reported that Arnold had refused to pick up a faucet for a customer, stating that he had business to take care of and that it could wait. (Defendant's Ex. D-2). Arnold denies that he refused to do this. (Arnold Depo. at 80). However, there is no question that he received a letter of reprimand.

On another occasion, February 21, 2008, it was alleged that a call came in for emergency services at Children's Hospital in Birmingham which Arnold, who was on-call, was asked to take. He allegedly refused the call, stating that he was in Bessemer. He received another letter of reprimand for this, dated February 22, 2008. Arnold states that he did not refuse the call; instead, he merely advised Holiday that it would take a while for him to get to the hospital because he was in Bessemer and would have to go from there to the shop to get the truck before he could respond. He

testified that he was told, "no, that's all right, and they left it at that and the next morning they never said anything else to me about it."  (Arnold Depo. at 81-82).

There were also claims that Arnold's work performance cost the company money.  One such incident involved a customer, The Point Apartments.  Viewing the incident from Arnold's testimony, he was called out on a service call to the apartments and found a problem with a PRV,[9] which he repaired.  However, the repair did not hold and it necessitated another service call by Arnold wherein he replaced the PRV with a new one.  (Arnold Depo. at 75-78).  Subsequently, Holiday paid $1,000.00 for a water bill that resulted from Arnold's failure to successfully complete the repair in the first instance.  (Defendant's Ex. D-4).

On another occasion, Arnold damaged a marble counter top.  (Defendant's Ex. D-5, Invoice).  Arnold acknowledges that he damaged this counter but asserts that it is the only time he ever damaged a customer's property and that he paid to replace it himself.  (Decl. of Bill Arnold at 11).

Arnold has provided no direct evidence of discrimination.  He testified that on one occasion, he got into an argument with a co-employee when the co-employee "jumped up and called me the N word."  (Arnold Depo. at 85).  According to Arnold, this dispute was heard by Bill Holcomb, Sr., and Bill Holcomb, Jr., who were both

---

[9]  No one explains what a PRV is or does.  However, this is an acronym commonly used for "pressure relief valve."

in the office at that time.  Arnold states that "They told us to shut it off or whatever, or whatever and stop." (*Id.* at 87).  Arnold stated that the incident upset him so much that he got in his truck and left work for the day without approval.  (*Id.*).

According to Arnold, during his employment with Holiday, he received three loans from his employer.  The first two were for around $1,400.00 or $1,700.00.  One was to pay off a garnishment.  He paid these loans back by having it taken out of his paycheck.  (*Id.* at 49).  The third loan from Holiday was for $4,200.00.  It was an interest-free loan.  (*Id.* at 48).  This also was repaid through payroll deductions.  Arnold states that he over-paid the loan, but he was paid back for the overage.  (*Id.* at 48-49).  Although Arnold never checked the calculations to make sure he received the correct amount back, he "was pleased with what they gave me back." (*Id.* at 51).

When asked the basis for his feeling that he was the subject of discrimination, Arnold stated:

> Because I assume at the time I was the only black there and a lot of times when the work table, we'd get at the work table to dispatch jobs, you know, all the other white employees they get jobs and they tell me they don't have nothing for me, what I guess it was based on the knowledge that due to the loan and the confusion about the loan, I think they was upset with me about it, and a lot of time they wouldn't send me out on jobs and all the other plumbers get jobs and I'm the only one at the office and I feel like I was being discriminated against then.

(*Id*. at 52-53).  Thus, he states that he was the only African-American working for Holiday and the white employees would get jobs and he would not.  However, he then states that he believes this was "due to the loan and the confusion about the loan." (*Id*.).

When asked why he believed he was terminated from Holiday Plumbing, Arnold stated:

> I think it had a lot to do with the loan and the misunderstanding about the money and they feeling, you know, just, it's a whole lot of stuff that was going on at the time, the company was not doing real good and there was lot of frustration between me and the other employees because they had, they had issues that I didn't get along, you know, I didn't go along with, so I wasn't part of their little get-together or whatever, whatever, and I think, and I think that the owners knew about it, you know, but they disregarded it, you know, on the sake of their business keep going, and so, you know, and I think Debbie had a problem with me and why she had a problem with me is because of the loans and because, you know, when I have a problem with my check, I go back to her and she kind of got a little wishy-washy about that and whatever but as far as me and Junior were concerned, I don't think me and him had a problem because whatever problem we had we discussed it or whatever and everything was fine, but I think it was really based on just about the loan and about, because they discussed with us at one time that don't go back to the daddy for no information, you know, don't talk to him about nothing, but I knew that if I had a problem, I could go back to Senior it was kind of like when I went over their head and I think that started something and all kinds of, you know, like I do jobs and the jobs don't come out right and I make an error on the job and they was

> getting upset with me about that, which everybody in the
> company made errors, you know what I'm saying, but, and
> I'm just speaking about myself, I don't have anything to do
> with them, but I'm talking about me and it just, everything
> just started, ever since daddy left, the company, as far as
> being them concerned, everything just started going
> downhill and for what apparent reason, I guess, it had to do
> with the money, my job performance or whatever may be,
> I don't know what it was, but I knows the issue.

(*Id*. at 83-85).  Nowhere in this rambling dissertation does plaintiff claim that he was

terminated because of his race.

According to both Debbie Holcomb and Bill Holcomb, Jr., plaintiff was

entitled to a week of vacation and was paid for it after his termination.  (D. Holcomb

Depo. at 96-97).  He was terminated because they returned from a short trip to find

that he had taken vacation without providing the advance notice required by company

policy.  (*Id*. at 91-97; B. Holcomb Depo. at 31-36).  Plaintiff disputes this and claims

that he obtained permission for the time off from Debbie Holcomb.  (Arnold Depo.

at 71-72; Arnold Decl. at ¶ 8).  He also asserts that he knows of several Caucasian

plumbers, including Richard Dudley, Jamie Nash, and Chris McGhee, who took

several days off without calling in but who were not fired.  (Arnold Decl. at ¶ 8).

According to Debbie Holcomb, no one was ever hired to replace Arnold.

(D. Holcomb Depo. at 104-05).  Arnold's only evidence to the contrary is the hearsay

statement from another employee, in a conversation that occurred either a couple of

weeks (Arnold Decl. at ¶ 6) or three or four months (Arnold Depo. at 42) after his termination, wherein the employee told plaintiff that another person riding in the truck with the employee was hired as Arnold's replacement.  This statement is hearsay, contains no information regarding the declarant's basis of knowledge, and does not fall under any exception to the prohibition against hearsay found in the Federal Rules of Evidence.  Therefore, the testimony that Arnold was not replaced when he was terminated is unrefuted by any reliable, admissible evidence.

However, Arnold can still establish a *prima facie* case of discrimination if he can show that there were employees, not within his protected class, who were similarly situated in all relevant respects, but who were treated more favorably.  *See Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998), *cert. denied*, 528 U.S. 809, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999); *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).  In determining whether employees were similarly situated and more favorably treated, this court must consider whether the employees were treated in the same way as plaintiff.  The adequacy of the comparators is crucial.  *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).  "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the

employees are similarly situated in all relevant respects."   *Holifield*, 115 F.3d at 1561.

Arnold has failed to provide any valid comparators.  Plaintiff was terminated by Bill Holcomb, Jr.  At the time of his termination, Arnold had received at least two written reprimands from Holcomb for work-related incidents.  Plaintiff acknowledges that at least one of those incidents did, in fact, occur.  Likewise, Arnold admits that he damaged a customer's counter top that had to be replaced and attempted to repair a PRV for a customer that was unsuccessful, necessitating its replacement.  This resulted in Holiday reimbursing the customer $1,000.00 for a water bill.  Thus, although plaintiff has provided some evidence that there were other Caucasian employees who took unauthorized leave who were not disciplined, he has not shown that any of them had been previously reprimanded for doing unauthorized work in violation of Holiday Plumbing policy or had other performance-related problems. Thus, there do not appear to be any proper comparators sufficient to establish a *prima facie* case of discrimination.

Nonetheless, according to the Eleventh Circuit:

> [T]he requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible.  *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991); *Jones*, 874 F.2d at 1538; *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987).  In cases where the evidence does not fit neatly into the classic *prima facie*

case formula, for example, we have stated that "[a] *prima facie* case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'" *Hill*, 841 F.2d at 1540 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

*Schoenfeld v. Babbitt*, 168 F.3d at 1268.

Plaintiff was terminated after being falsely accused of taking unapproved vacation time.  Other Caucasian employees had taken unauthorized leave without being terminated.  He was the only African-American employee working at Holiday Plumbing at the time of his termination.[10]  However, he admittedly had performance-related problems, although he admits to fewer than the number asserted by defendant.  Likewise, on three occasions during his employment he was provided with interest-free loans from the company.  Although, with regard to one loan, a substantial overpayment was deducted  from his wages, when he brought it to the attention of his employer, the overage was returned and he states he was "satisfied" with what he was given.  Although he implies that there may have been some hard feelings related to this incident, there is no evidence that the overcharge was intentional.  Furthermore, when asked why he believed he was terminated by Holiday, plaintiff never mentioned

---

[10]  The only other African-American employee to work for Holiday was Arnold's son, who was not employed there at the time of Arnold's termination.

race as a basis.  Thus, the only evidence presented by plaintiff that may indicate discrimination in his termination is his claim that he was fired for taking unapproved vacation time when, in fact, his vacation time had been approved by the company a month in advance.  This single instance is simply insufficient to establish that Arnold was fired based on racial animus.  *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII is not a shield against harsh treatment at the workplace. . . .  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (internal quotes and citations omitted)).

Arnold also has failed to rebut defendant's legitimate, non-discriminatory reason for his termination or demonstrate a genuine issue of material fact that the proffered reasons were a pretext for discrimination.  Although he denies certain claims of performance deficiencies, such as taking unauthorized vacation, he admits to others.  He has presented insufficient evidence of pretext.

Based on the foregoing, the court finds that defendant's motion for summary judgment is due to be granted with respect to all claims asserted by plaintiff and this action dismissed with prejudice.  A separate order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 23rd day of August, 2010.


HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE